IN RE APPLICATION OF LAND O' LAKES CREAMERIES,
INC., FOR DETERMINATION OF ITS STATUS
AS A SEASONAL EMPLOYER.
MINNESOTA STATE FEDERATION OF LABOR IN BEHALF
OF ITS AFFILIATED ORGANIZATION AND THE
EMPLOYEES OF LAND O' LAKES CREAMERIES,
INC., v. LAND O' LAKES CREAMERIES, INC.[1]

January 14, 1955.

Nos. 36,383, 36,384, 36,385.

---

[1]Reported in 68 N. W. (2d) 256.

*Doherty, Rumble & Butler* and *Harold Jordan,* for relator.

*William D. Gunn* and *Donald C. Savelkoul,* for respondents.

*J. A. A. Burnquist,* Attorney General, *K. D. Stalland,* Assistant Attorney General, *George W. Olson* and *Roman H. Weide,* for respondent State of Minnesota.

DELL, CHIEF JUSTICE.

Certiorari to the department of employment security to review decisions of the commissioner denying relator's applications for determination as a seasonal employer.

Three separate appeals have been consolidated for the purpose of review. Relator is a corporation dealing primarily in dairy products, feeds, fertilizer, seed, poultry, turkeys, and eggs. It operates poultry-processing plants at Aitkin, Thief River Falls, Albert Lea, and elsewhere. Relator duly applied to the department of employment security for a determination that certain of its operations at the plants mentioned qualified as a "seasonal employment" industry within the meaning of the Minnesota employment security law.[2]

The facts necessary to the determination of the issues herein considered are essentially the same in all three cases. The plant at Albert Lea is engaged in processing chickens and turkeys, operating a hatchery, and processing eggs. In addition there is a locker plant and a wholesale and retail department for feeds, fertilizer, and poultry supplies. About 40 regular employees are on a year-round payroll. In the processing operation up to 85 people have been employed, 10 to 15 percent of whom are regular employees. The temporary employees consist mostly of local housewives. While both chickens and turkeys are produced, over 75 percent of the processing deals with turkeys. A large percentage of chickens are both bought and sold in a live state while turkeys are purchased only for processing. Since 1953 the only turkeys processed at the plant were live

---

[2] M. S. A. 268.07, subd. 5 (1). The practical effect of such a determination is ordinarily to reduce unemployment compensation benefits allowed to a claimant and the rate of contributions made by the employer.

birds although in prior years many birds came to the plant already dressed and were eviscerated there.

Relator hatches both chickens and turkeys from February through June. The turkey poults and chicks are then sold to local growers. During the last five or six months of the year, the grown turkeys are purchased by the relator and processed in a continuous series of steps beginning with the killing of the bird and ending with boxing and preservation by freezing. With the exception of a few breeder hens, all the turkeys that are hatched in one year are processed and disposed of in the same year. Chickens, on the other hand, are customarily kept by the growers beyond the year in which they are hatched for the purpose of producing eggs. While some chickens are processed during the turkey-processing season, their processing is kept separate because of a difference in the methods used. The same employees are used in both operations, however.

At the Aitkin plant chickens are not processed; there are fewer regular employees; and the processing operations are confined to a somewhat shorter period. At the Thief River Falls plant, relator operates certain additional activities not occurring elsewhere.

Hearings were held with respect to all three establishments, and the referee found in each case that the relator was engaged in activities relating to the first processing of a seasonally produced agricultural product, and that its operations in processing turkeys were seasonal operations. As regards the Thief River Falls and Albert Lea plants, the referee decided that the operations in processing chickens were not seasonal operations but were not in sufficient amount to either affect the length of the season or the nature of the seasonal operations as regards turkeys. He further held that the customary period[3] of such seasonal operations was a period of 145 days in any calendar year, for the calendar year of 1953 and thereafter until redetermined. On appeal to the commissioner, the decisions of the referee were reversed and all three applications of the relator denied.

---

[3]M. S. A. 268.04, subd. 26, provides that "wage credits" with respect to wages paid for seasonal employment means that proportion of the wages which the *customary period* of operations bears to the calendar year.

This controversy is concerned with the interpretation of M. S. A. 268.07, subd. 5(1), which provides:

" 'Seasonal employment' means employment in any industry or any establishment or class of occupation in any industry which is engaged in activities relating to the *first processing of seasonally produced agricultural products in which, because of the seasonal nature thereof, it is customary to operate only during a regularly recurring period or periods of less than 26 weeks in any calendar year.* The commissioner shall, after investigation and hearing, determine and may thereafter from time to time redetermine such customary period or periods of seasonal operations. Until the effective date of such determination by the commissioner, no employment shall be deemed seasonal." (Italics supplied.)

Relator contends that the decision of the commissioner that its operations with respect to turkey processing do not fall within the purview of this statute is not justified by the evidence and is contrary to the law. It is conceded that turkeys are agricultural products within the meaning of the statute and that the processing of a bird received in a live state is a "first processing" operation. It is also clear, and the relator does not argue otherwise, that the processing of chickens is nonseasonal, and employment in this particular activity is not "seasonal employment" within the statutory meaning of that term. Respondent contends that, since some temporary employees process both chickens and turkeys, relator cannot claim the seasonal exemption, at least with respect to the plants at Albert Lea and Thief River Falls, on the theory that in order to be engaged in seasonal employment the employee must be exclusively engaged in the seasonal activity. The argument is not persuasive where, as in this case, the time spent in the nonseasonal activity is insignificant in comparison with that devoted to the allegedly seasonal production. The evidence clearly shows that the processing of chickens during the turkey processing season is only a minor and incidental part of the latter operation. Moreover, an examination of the memorandums attached to the commissioner's decisions indicate that this

was not the motivating reason for reversing the decision of the referee.

Nor do we feel that there is any real question as to whether the turkeys are seasonally produced in the sense that they are processed at a particular period or season of the year. The records show that the vast majority of the operation is confined to the last five months of the year. In his memorandums the commissioner specifically pointed out that "the processing season ordinarily is from August to the following January." The fact that in one year relator's operation exceeded the 26-week period specified by the statute does not in itself render the activity nonseasonal. The statute requires only that the operation be "customarily" carried on during a regularly recurring period of the year.[4] If the usual and habitual practice is to restrict the operation to the period of time prescribed by the statute, minor and infrequent deviations should not be permitted to alter the otherwise seasonal nature of the operation.

The core of this controversy is whether turkeys are seasonally produced *because of their seasonal nature.* It is the position of the commissioner and the respondents that, if the product is seasonally produced at the will of the employer and not because the natural elements necessitate it, the product is not of a seasonal nature. While no cases can be found precisely in point,[5] reference has been made to applications of similar phraseology used in other types of statutes, such as workmen's compensation laws. For example, harvesting ice,[6] canning perishable vegetables,[7] salmon catching and canning,[8] beet sugar factory,[9] and fruit picking[10] have been said

---

[4]For a treatment of the term "customary," see Layman v. State Unemployment Comp. Comm. 167 Ore. 379, 117 P. (2d) 974, 136 A. L. R. 1468.

[5]See, Annotation, 136 A. L. R. 1480.

[6]Matter of Blatchley v. Dairymen's League Co-op. Assn. Inc. 225 App. Div. 167, 232 N. Y. S. 437.

[7]Shoop v. Sycamore Preserve Works Corp. (N. D. Ill.) 88 F. Supp. 845.

[8]Unemployment Comp. Comm. v. Aragon, 329 U. S. 143, 67 S. Ct. 245, 91 L. ed. 136.

[9]Bielke v. American Crystal Sugar Co. 206 Minn. 308, 288 N. W. 584.

[10]See, Froehly v. Harton, 291 Pa. 157, 163, 139 A. 727, 730.

to be seasonal in nature.[11] Although not strictly analogous, these cases do support the proposition that seasonal employment, at least when used in connection with agricultural products, refers to occupations that, because of general climatic conditions, can be carried on from a practical standpoint only during certain periods of the year.[12] It seems clear that as used in the statute under consideration the seasonal nature of a product is not something that is determined by the producer or by market fluctuations, but rather is controlled by elements peculiar to a particular period of the year which limit production and affect the time at which the product is most suitable for first processing.

Regulations of the department of employment security, promulgated pursuant to statutory authority,[13] in part embody this concept by providing:

" 'Seasonally produced agricultural products' means agricultural products which are customarily produced only within periods of less than one year in length and does not include agricultural products which may be produced at any or all times within the calendar year."[14]

The literal import of this regulation, however, is that if a product *can possibly* be produced at any or all times during the year it is not seasonal in nature. It seems evident that many agricultural products can, under modern scientific methods, be produced all year

---

[11]See, also, Pryor v. Brickley, 40 Del. 5, 5 A. (2d) 242 (carpenter work nonseasonal but "dependent upon the weather" in the sense that it is affected by fluctuations in weather which might occur in any season of the year) ; Hiestand v. Ristau, 135 Neb. 881, 284 N. W. 756; Hogsett v. Cinek Coal & Feed Co. 127 Neb. 393, 255 N. W. 546, 93 A. L. R. 305 (delivering coal not seasonal) ; Lincoln Gas & Elec. Light Co. v. Watkins, 113 Neb. 619, 204 N. W. 391.

[12]For an interesting distinction between "seasonal employment" and employment made impracticable because of "seasonal conditions," see Layman v. State Unemployment Comp. Comm. 167 Ore. 379, 391 to 392, 117 P. (2d) 974, 979, 136 A. L. R. 1468, 1475.

[13]M. S. A. 268.12, subd. 3.

[14]State of Minnesota, Department of Employment Security, Regulation 6(1), August 20, 1945.

around. In many instances, however, the high cost of the necessary equipment does not make extensive production economically feasible. Unless the regulation is interpreted to mean that any product which, *in accordance with customary methods of production and economic feasibility,* can be produced at any time during the year is non-seasonal, we feel that it unduly restricts the meaning of the statute and is, therefore, a nullity.[15]

It follows that relator's status as a seasonal employer rests on a determination of whether it is feasible and practical in this state, by the use of commonly accepted methods, to produce turkeys at any time during the year. There is no question that some types of turkeys can and are being raised indoors as well as outdoors. Relator submits, however, that it is common knowledge that turkeys are primarily produced outdoors and, because young turkeys are extremely sensitive to the elements, this must be done during the summer months. Respondent, on the other hand, contends that substantial numbers of turkeys are raised indoors and the economic feasibility of such production is shown by recognized present-day practices. The evidence regarding these practices, the competency of some of which is in doubt, is at best vague and uncertain. We find no evidence which can be said to reasonably support the commissioner's conclusion that the production of turkeys "is governed entirely by use and market conditions without relation to seasons established by nature in Minnesota." Apparently the commissioner believed that the feasibility and availability of year-round production of turkeys was a matter of common knowledge. On the contrary, it appears to us to be a matter subject to dispute. There is some indication that the practicability of indoor production is dependent upon the type of turkey produced. If the evidence establishes such a fact, there is no sound reason prohibiting a determination of seasonability as regards the production of one type of turkey even though other types may be found to be of a nonseasonal nature.

[15]See, Juster Bros. Inc. v. Christgau, 214 Minn. 108, 7 N. W. .(2d) 501; Bielke v. American Crystal Sugar Co. 206 Minn. 308, 288 N. W. 584.

On the present state of the record we feel that there is insufficient evidence to sustain either the relator's or the respondents' position. Since the burden is on the relator to show the seasonal nature of his activities, ordinarily the decision of the commissioner denying the requested determination would stand. However, since there has been such extensive reliance by all parties on facts supposedly of common knowledge, and because of the statewide importance of the issue before us, as it affects both employers and employees, we feel that the interests of justice will best be served by remanding the proceedings with leave to the parties to offer further evidence substantiating their positions. The determination of the issue involved should properly rest on competent evidence of record rather than on what is claimed to be common knowledge. If, upon a rehearing, the evidence establishes that turkeys, or a particular type of turkey, in accordance with customary methods of production and economic feasibility, can only be produced a part of the year, and that the employer is engaged in the processing of that type of turkey during a regularly recurring period or periods of less than 26 weeks in any calendar year, the commissioner should hold that the employer is engaged in seasonal employment within the meaning of the statute. On the other hand, if the employer processes a type of turkey that can, for practical purposes, be produced all year round, the requested determination as a seasonal employer should be denied. The burden of proceeding is, of course, upon the relator. After taking such additional evidence as is necessary to the determination of the issue involved, a new decision should be rendered in accordance with the applicable rule of law announced herein.

Remanded with directions.