IN RE APPLICATION OF LAND O' LAKES CREAMERIES,
INC., FOR DETERMINATION OF ITS STATUS
AS A SEASONAL EMPLOYER.
MINNESOTA STATE FEDERATION OF LABOR v.
LAND O' LAKES CREAMERIES, INC.

79 N. W. (2d) 366.

November 16, 1956—No. 36,925.

*Harold Jordan* and *Doherty, Rumble & Butler,* for relator.
*Donald C. Savelkoul,* for respondents.
*Miles Lord,* Attorney General, and *Harley G. Swenson,* Assistant Attorney General, for respondent commissioner.

NELSON, JUSTICE.

The matter here involved comes before this court for the second time on a writ of certiorari to review a decision of the commissioner of employment security.

The original review of this case is reported in In re Land O' Lakes' Status as Seasonal Employer, 243 Minn. 408, 68 N. W. (2d) 256. Mr. Chief Justice Dell speaking for the court in that opinion stated that (243 Minn. 412, 68 N. W. [2d] 259) "The core of this controversy is whether turkeys are seasonally produced *because of their seasonal nature.*" It was the position of the commissioner and the respondents on the first review, and it appears to be their position now, that, if the product involved is seasonally produced at the will of the employer and not because the natural elements necessitate it, the product is not of a seasonal nature.

We have been cited no cases precisely in point and none seem to be available. Reference is made in the above-cited case to applications of similar phraseology in other types of statutes, such as workmen's compensation laws. Attention was called to certain situations where the product has been said to be of a seasonal

nature, such as harvesting ice, canning perishable vegetables, salmon catching and canning, beet sugar factory, and fruit picking. The thought was expressed therein that the cases involving these examples, although not strictly analogous, did support the proposition that seasonal employment, at least when used in connection with agricultural products, refers to occupations that, because of general climatic conditions, can be carried on from a practical standpoint only during certain periods of the year.

This controversy concerns the interpretation of M. S. A. 268.07, subd. 5(1), which provides:

" 'Seasonal employment' means employment in any industry or any establishment or class of occupation in any industry which is engaged in activities relating to the *first processing of seasonally produced agricultural products in which, because of the seasonal nature thereof, it is customary to operate only during a regularly recurring period or periods of less than 26 weeks in any calendar year.* The commissioner shall, after investigation and hearing, determine and may thereafter from time to time redetermine such customary period or periods of seasonal operations. *Until the effective date of such determination by the commissioner, no employment shall be deemed seasonal.*" (Italics supplied.)

In its prior review in this case, this court said that (243 Minn. 413, 68 N. W. [2d] 260) "It seems clear that as used in the statute under consideration the seasonal nature of a product is not something that is determined by the producer or by market fluctuations, but rather is controlled by elements peculiar to a particular period of the year which limit production and affect the time at which the product is most suitable for first processing." This concept, at least in part, is embodied in a regulation of the Department of Employment Security, which has been promulgated pursuant to authority found in § 268.12, subd. 3, and which reads as follows (State of Minnesota, Department of Employment Security, Regulation 6[1], August 20, 1945):

" 'Seasonally produced agricultural products' means agricultural products which are customarily produced only within periods of less

than one year in length and does not include agricultural products which may be produced at any or all times within the calendar year."

No doubt many agricultural products can, under our present advanced scientific methods, be produced all year around. The regulation must be taken to mean that, if a product can reasonably be produced at any or all times during the year, or nearly so, it is not seasonal in nature.

Attention has been called to the fact that, in many instances, the high cost of necessary equipment might well interfere to the extent that extensive production would not become economically feasible. This court, however, on the former review went on to say that (243 Minn. 414, 68 N. W. [2d] 260) "Unless the regulation is interpreted to mean that any product which, *in accordance with customary methods of production and economic feasibility,* can be produced at any time during the year is nonseasonal, we feel that it unduly restricts the meaning of the statute and is, therefore, a nullity," citing Juster Bros. Inc. v. Christgau, 214 Minn. 108, 7 N. W. (2d) 501; Bielke v. American Crystal Sugar Co. 206 Minn. 308, 288 N. W. 584. It was made clear in the opinion that relator's status as a seasonal employer must rest on a determination of whether it is feasible and practical in this state, by the use of commonly accepted methods, to produce turkeys at any time during the year.

This court had no difficulty in coming to the conclusion then that some types of turkeys can and are being raised indoors as well as outdoors. Relator in that case argued that it is common knowledge that turkeys are primarily produced outdoors and, because young turkeys are extremely sensitive to the elements, this must be done during the summer months; that turkey raising on any extensive scale at all was therefore seasonal. Respondents in opposition thereto contended that there were substantial numbers of turkeys being raised indoors and that the economic feasibility of such turkey production is shown by recognized present-day practices. We felt in that case that the competency of some of the evidence submitted regarding these practices was at best vague and

uncertain; that evidence to reasonably support the commissioner's conclusion that the production of turkeys (243 Minn. 414, 68 N. W. [2d] 261) "is governed entirely by use and market conditions without relation to seasons established by nature in Minnesota" was lacking; and that too much reliance was placed upon what was referred to in the record as being matters of common knowledge when in fact the record clearly disclosed that these were matters subject to dispute. There was an indication that the practicability of indoor production is dependent upon the type of turkey produced. That issue appeared to be supported legally by claims of common knowledge rather than actual evidence. We said in that opinion that, if the evidence establishes such a fact, there is no sound reason prohibiting a determination of what is seasonal as regards the production of one type of turkey even though other types may be found to be of a nonseasonal nature. We held that there was insufficient evidence to sustain either the relator's or the respondents' position; that, since the burden was on the relator to show the seasonal nature of his activities, ordinarily the decision of the commissioner determining the issues of fact and denying the requested determination would stand; but that a remand of the case for the taking of further testimony and a redetermination of the issues by the commissioner would best serve the rights of both parties. This court then went on to say that (243 Minn. 415, 68 N. W. [2d] 261):

"* * * since there has been such extensive reliance by all parties on facts supposedly of common knowledge, and because of the statewide importance of the issue before us, as it affects both employers and employees, we feel that the interests of justice will best be served by remanding the proceedings with leave to the parties to offer further evidence substantiating their positions. The determination of the issue involved should properly rest on competent evidence of record rather than on what is claimed to be common knowledge. *If, upon a rehearing, the evidence establishes that turkeys, or a particular type of turkey, in accordance with customary methods of production and economic feasibility, can only be produced a part*

*of the year, and that the employer is engaged in the processing of*
*that type of turkey during a regularly recurring period or periods*
*of less than 26 weeks in any calendar year, the commissioner should*
*hold that the employer is engaged in seasonal employment within*
*the meaning of the statute. On the other hand, if the employer*
*processes a type of turkey that can, for practical purposes, be pro-*
*duced all year round, the requested determination as a seasonal*
*employer should be denied.* The burden of proceeding is, of course,
upon the relator. After taking such additional evidence as is neces-
sary to the determination of the issue involved, a new decision should
be rendered in accordance with the applicable rule of law announced
herein." (Italics supplied.)

The witnesses for relator at the hearing on remand included
Roy A. Bodin, residing in St. Paul, Minnesota, and at the time
agricultural statistician for the Department of Agriculture, state
and Federal; Frank Root, the branch manager for Land O' Lakes
Creameries, Inc., at Aitkin, Minnesota; and Carl Locken, who has
since 1947 been employed as the assistant to procurement supervisor
for relator's procurement and processing plant at the main office in
Minneapolis, Minnesota. Respondents called two witnesses: Howard
Holden, an extensive turkey grower from Northfield, Minnesota, and
John Tallman, general manager of Faribo Turkeys, Inc., which com-
pany specializes in turkey processing.

Relator's witness Bodin testified that his duties consist of gather-
ing statistics on agricultural production and that he had prepared
exhibit H placed in evidence, which states the monthly production
of turkey poults. This exhibit indicates that the heavy breed poults
are produced from the month of January through the month of
July, which would indicate that the heavy breeds are raised through-
out the year since the maturity period for the heavy turkey is six
months. This witness specifically stated that he had no experience
with turkey production and was not an expert in that field.

Relator's witness Root testified to having been associated with
turkey enterprises since 1932. He stated that generally speaking the
heavy breed turkey is produced on a seasonal basis. He stated that

he himself had not seen the heavy breed turkey raised in confinement and that he believed such a practice to be impractical. He did not comment on the practicability of raising heavy breed turkeys in partial or semiconfinement during certain periods of the year.

Relator's other witness, Locken, is employed at the relator's main office in Minneapolis. He testified that it is his duty to exercise supervision and control over relator's turkey processing plants and that relator's turkey processing plants are operating only in the last six months of the year. It does not appear from his testimony that he is familiar with methods of turkey growers or turkey production.

Respondents' witness Holden testified to being a turkey raiser since 1939. He operates a turkey farm near Northfield, Minnesota, and grows turkeys the year around. He states that in 1954 he was raising the heavy breed bronze turkey from February to the first of November. He states that, by using a semiconfined area during certain periods of the year, the heavy breed turkey can be and is practically raised the year around. In February 1954 he started his first heavy bronze turkeys which he began selling in the month of June; he started another bronze batch of poults in May which he later sold in October and November, and another batch of bronze poults in the month of April which he sold in October and November; and in the month of August he started his batch of poults for broilers. He said that, in the raising of the February flock, he used the brooder house during the months of February and March; later he confined the growing of heavy bronze turkeys to area alongside the brooder house with shelter available when needed; and in the month of May placed them on the range. His testimony was to the effect that he finds this method of operation feasible and that he knows of many other growers in his area that operate similarly.

Holden indicated by his testimony that market conditions would dictate what was actually raised by the turkey growers. There was also testimony to the effect that when broilers were first raised in this state it was confined to Beltsville Whites, but that later what is known and described as broad breasted whites, which are heavy turkeys, took the place of the lighter Beltsvilles for marketing as

broilers. For example, in the year 1954, Holden started 10,000 heavy bronze turkeys growing in the first of February; 3,500 bronze in April; 9,000 bronze in May; 4,000 broilers (Beltsville Whites) early in August, and 12,000 broad breasted whites, also a heavy type of turkey, in December for marketing as broilers in the middle of April 1955.

The other witness, Tallman, called by respondents is the general manager of a turkey processing plant located at Faribault, Minnesota, which it appears from the testimony produced a little over 7 million pounds of turkeys in 1953 and 10 million pounds in 1954. Also that it operates on a year-round basis employing 125 employees, regularly. He testified that his plant processes the heavy breed turkey from June 1 through February of the next year. He states that Holden's method of raising turkeys is practical and is used by other growers in his area.

It would appear from the testimony of respondents' witnesses that, when all things are considered, a combination of market, labor, and equipment factors rather than weather conditions determine when turkeys of any type or breed are to be produced. Relator's witness Root admitted that it is possible to raise a broad breasted turkey, which means a heavy turkey, to maturity indoors if you have sufficient equipment and labor and that large turkeys (presumably bronze) could be grown to maturity in semiconfinement.

It appears from the testimony that with apparent success the witness Holden raised 10,000 turkeys to maturity in the winter months of January and February. The testimony of respondents' witnesses indicate that about 20 other turkey raisers in their vicinity and about southern Minnesota conducted wintertime operations in a similar manner and that there are other processors in the state of Minnesota who operate on a year-round basis located at Willmar, Madelia, Butterfield, Litchfield, Altura, and as far north as Detroit Lakes.

Tallman testified that the same processing is done for bronze turkeys as for broilers.

 The referee made findings of fact and entered his decision after the testimony taken on the remand. He found as fact "That turkeys, in accordance with customary methods and economic feasibility, can be and are produced at any and all times of the year in Minnesota and they are not a seasonally produced agricultural product." He entered his decision "That turkeys produced in Minnesota are not a seasonally produced agricultural product," and "That the activities of Land O' Lakes Creameries Inc. in processing turkeys in its plants at Aitkin, Albert Lea and Thief River Falls, Minnesota, are not activities relating to the first processing of seasonally produced agricultural products." He denied the application of relator for a determination as a seasonal employer. He based his decision upon what he determined from the evidence taken on the remand as clearly showing that turkeys of the kind and breed processed by the relator not only can be but are being produced on a year-round basis by producers in Minnesota, permitting a finding that the seasonal character of the relator's operations is not based upon the seasonal nature of the agricultural product it processes. The commissioner's decision affirming the decision of the referee was filed February 28, 1956, following an appeal by relator from the referee's findings of fact and decision.

 The commissioner's memorandum attached to his decision would indicate that it was the commissioner's view that the relator, having the burden of the proceedings, had failed to establish that "in accordance with customary methods of production and economic feasibility," the type of turkey processed by relator, the heavy bronze, can only be grown and produced a part of the year; that the record disclosed affirmative evidence that this type of turkey can, in accordance with customary methods of production and economic feasibility, be produced all year round and has been and is being so produced.

 The commissioner has been charged by the legislature with determining, after investigation and hearing, and with redetermining from time to time thereafter, such customary period or periods of seasonal operations as the statute permits. It is also provided

that, until the effective date of such determination by the commissioner, no employment shall be deemed seasonal.

The commissioner of employment security was made a respondent by virtue of § 268.10, subd. 10. The commissioner finds the facts. Thus the question here is whether the evidence reasonably tends to sustain the commissioner's findings and decision for in reviewing the commissioner's order and decision all that need be determined by this court is whether the evidence is such that the commissioner might reasonably make the order and decision which he has made herein. The proceeding which brings this matter before us for review limits our consideration to determining whether the findings of fact made by the factfinding tribunal, in this instance the commissioner, are arbitrary and clearly and manifestly against the evidence.

With these rules in mind, we have no other alternative upon the record as now submitted but to affirm the findings and decision of the commissioner.[1]

Affirmed.

---

[1]Honeymead Products Co. v. Christgau, 234 Minn. 108, 47 N. W. (2d) 754; Chellson v. State Div. of Employment & Security, 214 Minn. 332, 8 N. W. (2d) 42; State ex rel. Rockwell v. State Board of Education, 213 Minn. 184, 6 N. W. (2d) 251, 143 A. L. R. 503; Hamlin v. The Coolerator Co. 227 Minn. 437, 35 N. W. (2d) 616; 1 Dunnell, Dig. (3 ed.) § 397b; also see, Richard v. Federal Cartridge Corp. 217 Minn. 136, 14 N. W. (2d) 118; Lading v. City of Duluth, 153 Minn. 464, 190 N. W. 981.