## OTIS LODGE, INC. v. COMMISSIONER OF TAXATION.

206 N. W. 2d 3.

December 15, 1972—No. 43376.

*Lindquist & Vennum, Richard J. Fitzgerald,* and *David E. Krause,* for relator.

*Warren Spannaus,* Attorney General, and *Paul B. Saltzman* and *C. H. Luther,* Special Assistant Attorneys General, for respondent.

KELLY, JUSTICE.

Writ of certiorari to the Tax Court. Otis Lodge, Inc., seeks review of the Tax Court's determination that the lodge's opera-

tion is not "seasonal" within the meaning of Minn. St. 273.13. We reverse.

The stipulated facts indicate that Otis Lodge, Inc., owns approximately 260 acres of real estate in Itasca County. Most of the land is wooded. Improvements on the property include a winterized 21-unit motel, a dining room and cocktail lounge, an indoor swimming pool, a recreation room, 12 winterized cottages, 3 nonwinterized cottages, a golf course, a summer landing field, and a boat dock. The lodge's property is 3 miles from Sugar Hills, a ski resort which is a related corporation.

Almost all of the lodge's guests patronize the lodge during the usually warmer days of the year (which we will refer to without technical nicety and for convenience only as the summer months) for the purpose of golfing, swimming, and boating or during the colder weeks of the year (the winter season) for skiing. In 1968, which was a representative year, the lodge was open for 245 days and closed for 121 days. The summer season was from May 25 to September 8 for a total of 107 days. The winter season lasted 112 days, from January 1 to March 18 and from November 27 to December 31. Between seasons, the lodge was open for 26 days for private conventions.

Over 95 percent of the lodge's revenue is earned during the summer and winter seasons. July, August, and the first week in September earned the lodge 40 percent of its revenue. January, February, the last week of December, and the first week in March accounted for 42 percent. Thus, 82 percent of the gross receipts was earned in 5 months.

Minn. St. 273.13, subd. 9, places most commercial property in "class 4" and in 1969, the year in question, assessed it at 40 percent of its market value.[1] Subd. 4 of that section provides that "all real estate devoted to temporary and seasonal residential occupancy for recreational purposes" is categorized as "class

[1] The rate was increased to 43 percent by an amendment in 1971. Ex. Sess. L. 1971, c. 31, Art. 22, § 7.

3" and is assessed at 33⅓ percent of its market value, which is about 83 percent of 40 percent. The county assessor in making the 1969 assessment of the property, the commissioner of taxation, and the Tax Court determined that Otis Lodge is class 4 property. The lodge contends that its real estate belongs in class 3.

The Tax Court held that the real estate in question is devoted to temporary residential occupancy for recreational purposes, but that the occupancy is not seasonal, and determined for that reason that the property was class 4 property. Thus, the sole issue before this court is whether the occupancy was seasonal.

The commissioner of taxation contends that the word "seasonal," as used in Minn. St. 273.13, subd. 4, refers to property that is occupied for recreational purposes only during a particular season of the calendar year as distinguished from property that is or may be occupied throughout the year.

It is the contention of the lodge that occupancy of real estate is seasonal under this statute when it is used for recreational activities which are practical and feasible only during certain periods of the year because of climatic conditions.

The legislative history of Minn. St. 273.13, subd. 4, demonstrates an intent to provide tax relief to the resort industry. Formerly, the statute assessed "real estate devoted to temporary and seasonal residential occupancy for recreational purposes, but not devoted to commercial purposes" at 33⅓ percent. In 1967, the legislature deleted the words "but not devoted to commercial purposes" and thereby placed the commercial resort on the same footing as real estate which is similarly used but for noncommercial purposes.[2] There can be no doubt but that the legislature intended to give some tax relief to both commercial and private properties devoted to temporary seasonal and residential occupancy for recreational purposes. The definition we give to the word "seasonal" in this case will in all probability apply to noncommercial uses of property where a similar classi-

---

[2] Ex. Sess. L. 1967, c. 32, Art. 9, 1.

fication is sought. It becomes important then to discuss its application to both types of property under various circumstances to the end that our definition will turn out to be practical and reasonable in both instances.

The statute in question does not define the word "seasonal." Words and phrases are ordinarily to be construed according to rules of grammar and their common and approved usage. Minn. St. 645.08. Here we have a phrase to construe, i. e., "all real estate devoted to temporary and seasonal residential occupancy for recreational purposes." Because this phrase applies to noncommercial properties as well as to commercial, it is helpful to first consider its meaning in the first context. Most noncommercial cottages and cabins are generally used for at least occasional occupancy during the spring, summer, and fall. It becomes apparent then that the legislature did not intend that the tax break would be limited to those cottages only used during one of the classic four seasons. In recent years, the recreational activities of ice fishing, skiing, and snowmobiling have expanded tremendously and there has been, to some extent, an increase in the use of cottages in connection with these activities. Assuming, then, that a noncommercial cottage was used in connection with one of these activities during at least a few days during each of the four classic seasons but for a total of only 60 to 80 days out of any calendar year—would its use be "seasonal" as that word is used in the phrase to be construed? It seems obvious the word "seasonal" was used in a broad sense and, because it was used in the phrase "residential occupancy for recreational purposes," its nexus to the word "recreational" must be considered. In this light, it seems to make sense that the word "seasonal" refers to those periods of time during the year when various recreational activities are feasible because of the weather.

Perhaps some attention should be given to the use of the word "devoted" in the phrase we are interpreting. Does it mean, as used here, given "wholly and completely" or "chiefly" to "sea-

sonal residential occupancy for recreational purposes"?[3] Suppose the owner of a noncommercial cottage uses it between seasons for a few weekends to "get away from it all" and not because of any particular recreational activity that could be termed seasonal. Should this minimum use be grounds for denying that owner's real estate a class 3 status? We think that the word "devoted" means chiefly and not wholly because we don't think the legislature intended an absurd result. Furthermore, the phrase "devoted to" clearly means the use to which it is actually put, not the use or uses to which the property may be put.

The meaning of the phrase "devoted to temporary and seasonal residential occupancy for recreational purposes" should not be essentially different when the property is employed in commercial uses rather than noncommercial. The use of the lodge during the summer from May 25 to September 8, a total of 107 days, and in the winter from January 1 to March 18 and November 27 to December 31, a total of 112 days, was seasonal use. These periods of use were dictated by general climatic conditions that in turn permitted the recreational activities available in the area.

The occasional opening of the lodge for conventions, totaling 26 days in all, presents a different problem. There is no showing that this type of occupancy was in any manner connected with recreational purposes of a seasonal nature. Conventions held at lodges in the summer or winter months might and probably do have the dual purpose of carrying on convention business and permitting those attending the convention to engage in seasonal recreational activities. However, the lodge here was used on occasion for conventions between the seasons. Was the real estate nonetheless devoted to temporary and seasonal residential occupancy for recreational purposes? The answer to this is that if it was chiefly used for these purposes, it should have the class

---

[3] One of the meanings given to the word "devote" in Webster's Third International Dictionary (1961), p. 620, is "to attach the attention or center the activities of (oneself) wholly or chiefly on a specified * * * objective."

3 status. In arriving at the answer to this question, it is important to determine whether or not the nonseasonal use for 26 days was a significant use.

The real estate in question here was used only for a total of 245 days out of the year—26 of these days were for conventions. The lodge was closed for 121 days, or one-third of the year during the spring and fall. Over 95 percent of its gross receipts was earned during the summer and winter months, so that less than 5 percent of its gross receipts was earned from the conventions. Almost all of the lodge's guests patronize the lodge either during the weeks of summer for swimming, golfing, or boating or on the weekends and holidays of the winter for the purpose of skiing. We conclude from all of these facts that the use of the lodge for conventions between seasons was insignificant.

It is a fair assumption that the legislature intended to give a tax break to real estate devoted to temporary and seasonal residential occupancy for recreational purposes because it is not used the year around. If the lodge were not to get the tax break, its real property would be assessed at 40 percent of its full and true value under Minn. St. 1969, § 273.13, subd. 9. If it qualifies for the tax break under Minn. St. 273.13, subd. 4, its real property would be assessed at 33⅓ percent of its full and true value, which is about 83 percent of 40 percent. If the lodge had been used 83 percent of the year, it would have been open about 303 days. In fact, it was only used about two-thirds of the year, or for 245 days. It is doubtful that the legislature would intend to give a tax break out of proportion to the use. Here the use was not out of proportion to the tax break. The statute could have provided that any real property used for more than 303 days (or any other number of days) in the taxable year could not have the class 3 status.

We have considered other cases in which the word "seasonal" has been construed. Some of the decisions, while not controlling because the word "seasonal" was not used in the same context nor in the same setting, are nonetheless helpful. One of these

cases decided by this court is In re Land O' Lakes' Status as Seasonal Employer, 243 Minn. 408, 68 N. W. 2d 256 (1955). That case turned on whether turkeys were seasonally produced and the court stated (243 Minn. 412, 68 N. W. 2d 259):

"The core of this controversy is whether turkeys are seasonally produced *because of their seasonal nature.* It is the position of the commissioner and the respondents that, if the product is seasonally produced at the will of the employer and not because the natural elements necessitate it, the product is not of a seasonal nature. While no cases can be found precisely in point, reference has been made to applications of similar phraseology used in other types of statutes, such as workmen's compensation laws. For example, harvesting ice, canning perishable vegetables, salmon catching and canning, beet sugar factory, and fruit picking have been said to be seasonal in nature. Although not strictly analogous, these cases do support the proposition that seasonal employment, at least when used in connection with agricultural products, refers to occupations that, because of general climatic conditions, can be carried on from a practical standpoint only during certain periods of the year. It seems clear that as used in the statute under consideration the seasonal nature of a product is not something that is determined by the producer or by market fluctuations, but rather is controlled by elements peculiar to a particular period of the year which limit production and affect the time at which the product is most suitable for first processing."

Compare Bielke v. American Crystal Sugar Co. 206 Minn. 308, 288 N. W. 584 (1939), where the court stated (206 Minn. 311, 288 N. W. 586):

"* * * It is matter of common knowledge, herein so conceded all along, that in Minnesota beet sugar factories, except for the relatively small maintenance crews employed the year round, are engaged in a seasonal industry. *The longest work season, or 'campaign' does not exceed 90 days.*" (Italics supplied.)

The Land O' Lakes case was remanded for a determination of whether turkeys were seasonally produced under the above standard. On the second appeal, this court affirmed the decision of the Department of Employment Security that turkeys were not a seasonal product based upon a finding that factors other than climatic conditions caused the turkeys processed by the employer to be raised in recurring periods of the year. In re Land O' Lakes' Status as Seasonal Employer, 248 Minn. 230, 79 N. W. 2d 366 (1956).

The statement in the first Land O' Lakes case, quoted above, indicated that "seasonal employment," when used in connection with agricultural products, refers to occupations that because of general climatic conditions can be carried on from a practical standpoint only during certain periods of the year. We think the word "seasonal" was used in the phrase we are construing in much the same way.

The first Land O' Lakes case is helpful in disposing of other contentions made by the commissioner. One of them is that, because the lodge was equipped for both winter recreation and summer recreation, and was open for conventions between these two seasons, it is a business that can be carried on the year around. In Land O' Lakes a similar contention was made that turkeys were not seasonal if they could be produced at any time of the year, but this court adopted a different test: "* * * [W]hether it is feasible and practical in this state, by the use of commonly accepted methods, to produce turkeys at any time during the year." 243 Minn. 414, 68 N. W. 2d 260. If a similar test were to be applied in the instant case, the feasibility and practicality of keeping the lodge open all year would have to be considered. If we attempt to extend the commissioner's argument to noncommercial property, we would have to hold that cottages which were suitable for winter use and summer use could not command a class 3 status since they would be capable of being used the year around even though such use would not be desirable for recreational purposes.

A claim was also made in Land O' Lakes that in order to be engaged in seasonal employment, the employee must be engaged exclusively in the seasonal activity. This claim was based on the fact that some temporary employees processed both chickens and turkeys and that the processing of chickens was nonseasonal. This court stated (243 Minn. 411, 68 N. W. 2d 259):

"* * * The argument is not persuasive where, as in this case, the time spent in the nonseasonal activity is insignificant in comparison with that devoted to the allegedly seasonal production. The evidence clearly shows that the processing of chickens during the turkey processing season is only a minor and incidental part of the latter operation. Moreover, an examination of the memorandums attached to the commissioner's decisions indicate that this was not the motivating reason for reversing the decision of the referee."

We regard the opening of the lodge for 26 days as insignificant when the revenues and days involved are compared with the gross revenues and the total number of days the lodge was open.

The commissioner contends that a business cannot be seasonal if it is closed during certain periods of the year because of fluctuations in consumer demand. Obviously, where commercial resorts close during off-seasons, it is because there is no consumer demand, and there is no consumer demand because there are no recreational activities available because of climatic conditions. Thus, this contention results in a circular argument. The "lack of consumer demand" rationale would defeat any tax relief and thwart the intent of the legislature. What if we apply this contention of the commissioner to a noncommercial winterized cottage? If a cottage is usable the year around, it could not qualify for the partial exemption, even if the owner only used it for winter sports over a few weekends, since he could have used it the year around but just did not care to do so,—thus, in a sense, it wasn't used because of lack of demand.

Cases in other jurisdictions have considered this same factor of lack of consumer demand in determining the meaning of the word "seasonal." In In re Application of Racetracks of Ohio, 103 Ohio App. 503, 143 N. E. 2d 144 (1956), the court concluded that employment at the racetrack was seasonal. To be seasonal under the statute in question, employment had to occur, because of the weather, during regularly recurring periods of the year. The court held the fact that the climate limited horse racing in Ohio to a season was a matter of judicial notice (103 Ohio App. 505, 143 N. E. 2d 146):

"It is our opinion that, by reason of and without respect to the statute and by common knowledge of which courts could take judicial notice, the operation of the sport of horse racing in Ohio is seasonal, especially is this true if the operation is conducted for profit. *Manifestly, race meets conducted out of doors in the winter months would attract little or no attendance.* The race tracks are of practical use only for such meetings." (Italics supplied.)

In Johnstone v. Richardson, 103 Cal. App. 2d 41, 229 P. 2d 9 (1951), the right to a seasonal liquor license of a lodge located in a mountainous area of California was at issue. The mountain lodge remained open the entire year but received almost all of its business during vacation periods. The seasonal liquor license held by the lodge permitted it to sell alcoholic beverages only during the 9 months of the year when the lodge was visited by most of its customers. The court did not require a showing that the climate forced the lodge to discontinue its operations during the off-season. Also, the court rejected the argument that because the lodge remained open all year it was not entitled to a seasonal license. The court discovered a legislative purpose to provide a seasonal license for establishments selling liquors which regularly did most of their business during certain seasons because the number of customers available in the area also fluc-

tuated with those seasons. As a result, the court concluded as follows (103 Cal. App. 2d 47, 229 P. 2d 13):

"* * * *We think that, as used by the Legislature and by the board, the word 'seasonal' must be interpreted to refer to a business located in a seasonal area where the consumer demand fluctuates during different periods of the year.* This is in accord with the dictionary definition of the term. In· Webster's New International Dictionary (2d ed.) the first definition given of the term 'seasonal' is 'of, pertaining to, or occurring at, a particular season or seasons; as *seasonal* rates, demand,' etc. The secondary definition, which is the one contended for by appellant, is 'not continuously active.' We think that the word was used in the statute in the first sense above set forth." (Italics supplied in part.)

We conclude that the word "seasonal" as used in the phrase "real estate devoted to temporary and seasonal residential occupancy for recreational purposes" found in Minn. St. 273.13, subd. 4, means those periods of the year when recreational activities are practical and feasible because of climatic conditions. Lack of consumer demand because recreational activities are not available during certain periods of the year due to climatic conditions does not destroy the seasonal character of an operation.

Minn. St. 273.13, subd. 4, does not preclude real estate from being assessed at 33⅓ percent instead of 40 percent (now 43 percent) because it is capable of being used for purposes other than "temporary and seasonal residential occupancy for recreational purposes." The test is what is it devoted to and not what can it be devoted to. This is particularly so where other purposes are not feasible or practical from an economic standpoint.

Reversed.

UPON PETITION FOR REARGUMENT

On March 23, 1973, the following opinion was filed:

PER CURIAM.

The commissioner of taxation petitioned for a rehearing in

this case. The petition does not ask this court to reconsider its decision that the lodge's operation is seasonal. Instead, this court is requested to remand the case to the Tax Court to take additional evidence on an issue not presented or argued in this court, i.e., whether all of the Otis Lodge property was devoted to "residential" occupancy within the meaning of Minn. St. 273.13, subd. 4. The petition is denied.

This matter was originally heard by the commissioner of taxation, sitting as the State Board of Equalization. The commissioner denied the lodge's request to have its property classified as "temporary and seasonal residential occupancy for recreational purposes" under the above statute. Upon appeal to the Tax Court, the commissioner of taxation and the lodge submitted the case on stipulated facts. Paragraph 7 of that stipulation provides:

"The Commissioner refused to grant said property Class 3 classification and based his decision on the finding that the Lodge could not be classified as seasonal as is required by Class 3 property."

Thus, the commissioner of taxation in denying the lodge's request for a "class 3" classification for its property did so solely on the theory that its use was not "seasonal" within the meaning of the statute. The Tax Court in its order affirming the commissioner's decision stated: "The issue is whether appellant's real estate qualifies as 'devoted to temporary and seasonal residential occupation for recreational purposes.'"

The Tax Court in its memorandum stated:

"The question of whether the real estate of Otis Lodge is devoted to temporary and seasonal residential occupation for recreational purposes within the meaning of M.S.A. 273.14, Subd. 4, is determinative of the issue in this case. This involves the question whether the activities of appellant with reference to said real estate is 'seasonal' within the meaning of the statutes,

as there is no question that the real estate is devoted to temporary residential occupation for recreational purposes."

The issue on appeal to this court from the Tax Court as stated in the commissioner's brief was:

"Does Otis Lodge constitute 'real estate devoted to temporary and seasonal residential occupancy for recreational purposes' within the meaning of Minn. Stat., §273.13, subd. 4?"

However, the commissioner conceded in his brief to this court that the lodge's property consisted of real estate devoted to temporary residential occupancy, and the only issue was whether or not the property was devoted to seasonal use. That concession was made in the following words:

"There is no question that the Otis Lodge property is real estate devoted to temporary residential occupancy. However, it is clear from the language emphasized above, the Legislature did not intend that all resorts in the State of Minnesota be classified under §273.13, subd. 4, as class 3 property. Consequently, the question that must be answered in the case at hand, is whether or not said property is devoted to seasonal as well as temporary residential occupancy for recreational purposes."

The only reasonable conclusion that can be drawn from the foregoing facts is that the state's case ab initio was based on the theory that there was only one question involved and that was the meaning of the word "seasonal" as used in the statute. The point now being raised on the petition for rehearing having been conceded, and not having been raised previously on this appeal, is not properly before us. Lentz v. Pearson, 246 Minn. 145, 75 N. W. 2d 662 (1956). Furthermore, to grant the request would permit fragmented appeals contrary to the need for judicial economy.

The petition for rehearing is denied.

MR. JUSTICE TODD took no part in the consideration or decision of this case.

MR. JUSTICE MACLAUGHLIN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.