901 P.2d 751

Jesús MURILLO, Worker–Appellee,

v.

**PAYROLL EXPRESS and United States Fidelity & Guaranty Company, Employer/Insurer–Appellants.**

**No. 15740.**

Court of Appeals of New Mexico.

May 24, 1995.

Josephine D. Rohr, ·Robert R. Work, Albuquerque, for worker-appellee.

Timothy R. Briggs, Thomas R. Mack, Miller, Stratvert, Torgerson & Schlenker, P.A., Albuquerque, for employer/insurer-appellants.

## OPINION

BUSTAMANTE, Judge.

This is a worker's compensation case. Employer appeals, asserting three general issues: (1) Whether the Workers' Compensation Judge (WCJ) erred in the calculation of Worker's average weekly wage and compensation rate by not properly accounting for the seasonal nature of the employment and not accurately calculating the Worker's "real economic gain" from the employment; (2) Whether the WCJ erred by making an "unsupported and immaterial finding of fraud and sham in the agreement between Payroll Express and Leonard Jensen Logging" (referred to collectively as Employer); and (3) Whether the WCJ erred in its determination of the percentage of Worker's permanent partial disability. We affirm on all issues.

## STANDARD OF REVIEW

We apply a whole record standard of review when considering appeals from judgments of the Workers' Compensation Administration (Administration). *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 126–30, 767 P.2d 363, 365–69 (Ct.App.), *cert. denied*, 109 N.M. 33, 781 P.2d 305 (1988). Whole record review requires us to consider all the evidence properly admitted by the WCJ to determine whether there is substantial support for the judgment. *Id.* 108 N.M. at 128, 767 P.2d at 367. The entire record is viewed in the light most favorable to the judgment. *Martinez v. Southwest Landfills, Inc.*, 115 N.M. 181, 185, 848 P.2d 1108, 1112 (Ct.App.1993). We do not reweigh the evidence. *Herman v. Miners' Hosp.*, 111 N.M. 550, 553, 807 P.2d 734, 737 (1991). The possibility that the evidence would support a different result does not require reversal so long as the WCJ could properly reach the decision that was rendered. *Gallegos v. City of Albuquerque*, 115 N.M. 461, 465, 853 P.2d 163, 167 (Ct.App.), *cert. denied*, 115 N.M. 535, 854 P.2d 362 (1993). To warrant reversal, this Court must be persuaded it "cannot conscientiously say that the evidence supporting the decision is substantial, when viewed in the light that the whole record furnishes." *Tallman*, 108 N.M. at 129, 767 P.2d at 368.

## FACTUAL SUMMARY

Jesús Murillo (Worker) is a forty-five year old employee whose entire work history involves heavy, manual labor as a migrant farm worker and in the logging industry, primarily as a logger.

Worker was employed by Leonard Jensen Logging (Jensen Logging) as a logger for a period of two or three years prior to the July 27, 1990 injury which led to this action. Prior to that, Worker had worked primarily as a logger since 1977. In the logging industry, loggers are mainly responsible for felling trees. Other workers called loppers are responsible for trimming branches from the trees. Still, other workers—the skid crew—are responsible for moving the cut and trimmed logs to the trucks for eventual hauling to the sawmill.

Of these workers, loggers alone are paid on a piecework basis. Worker was paid $1.50 per log. What constitutes a "log" is defined by industry standards. The loppers and skid crew were paid by the hour. Loggers, such as Worker, were generally required to provide their own tools, in particular power chain saws and attendant accessories, spare parts, fuel, and lubricants. Worker was not reimbursed for his equipment expenses as such. Worker was responsible for providing his equipment and paying his expenses from his piecework pay.

It is unclear whether Worker was required to provide his own equipment pursuant to industry custom or the provisions of the "Cutters Contract" (the Contract) which Worker was required to sign with "Leonard Jensen Logging Company" on or about May 15, 1990. Worker testified that he was hired by Leonard Jensen (Jensen) without mention of a written contract. Worker was later presented the Contract to sign. The Contract is written in English and Worker could not read it for himself. However, the gist of the Contract was apparently translated to Worker at least once by the "woods boss," or foreman, Fidel Martinez (Martinez). Martinez is Jensen's son-in-law.

The Contract provides generally that: (1) the Worker will be paid "[$]1.50 per thousand board feet of lumber" cut by Worker; (2) Worker shall provide all tools, equipment and supplies required for work under the Contract; (3) Worker shall carry workmens' compensation insurance on himself and "his employees"; (4) as a service to Worker, Jensen Logging would withhold enough money from Worker's piece rate compensation to pay worker's compensation insurance premiums, plus all federal and state withholding and other taxes payable by Worker; and (5) Worker shall perform the work free from any control or right of control by Jensen Logging.

The extent to which the Contract actually controlled or described the legal and working relationship between Jensen Logging and Worker was the subject of much testimony and argument at trial. Employer argued that the Contract created an independent contractor relationship with Worker.

Worker argued that he understood he was an employee. The WCJ found Worker was an employee, not an independent contractor. Employer has not appealed this ruling and is now bound by the WCJ's decision. See Sanchez v. Memorial Gen. Hosp., 110 N.M. 683, 689, 798 P.2d 1069, 1075 (Ct.App.), cert. denied, 110 N.M. 653, 798 P.2d 1039 (1990).

The WCJ also found that Worker was an employee of Payroll Express, Inc. (Payroll). No one has challenged this finding and again all parties are bound by it. Despite this finding, Payroll's practical, working relationship with Worker and Jensen Logging can reasonably be characterized as murky. Payroll no longer exists and no one from Payroll testified at the trial. Jensen and Worker testified about their understanding of Payroll's role. Their testimony is consistent with and supportive of the WCJ's finding that the arrangements between Payroll and Jensen Logging were a sham and an effort to defraud Worker.

Worker testified that he was asked by Jensen to sign an application for employment with Payroll on May 16, 1990; in close proximity to the time he signed the Contract. Worker testified he did not understand the reason or need for signing the employment application with Payroll. Worker never spoke with anyone from Payroll about anything concerning his hire or work thereafter. No one from Payroll was ever on the job site. When injured, Worker reported his injury to Martinez. Worker never spoke with anyone at Payroll about the injury. In sum, from Worker's perspective, Jensen Logging was his only employer.

Worker testified that he was told he would receive two checks for his total pay. One would come from Payroll and one from Jensen Logging. Martinez, as woods boss, delivered both checks to Worker on payday. Worker was not given any choice with regard to the percentage to be paid through Payroll, and he never understood the reason for receiving two checks. Worker was told the money paid by Jensen Logging was being called "saw rental," but he did not understand the significance of, or reason for, the designation. Worker did not appreciate the

difference between W–2 wages and 1099 income for income tax purposes.

Jensen testified that Payroll was used to relieve Jensen Logging of all responsibility for taxation and insurance payments for his workers. With regard to loggers in particular, Jensen testified his intent was to avoid paying any taxes or insurance. Jensen Logging calculated a gross payment to the logger using the $1.50 per log piece rate. Jensen then assumed that 25% of the gross was to be treated as payroll or wages. There is no mention of this figure anywhere in the Contract or the application of employment with Payroll. Jensen sent the 25% of Worker's gross earnings to Payroll. From this amount Payroll paid Worker's: (1) FICA withholding, both employee's and employer's share, calculated on the 25% share sent to Payroll; (2) federal and state income tax withholding, again based on the 25% share sent to Payroll; (3) unemployment compensation premium, and (4) the workers' compensation insurance premium. Worker received an IRS W–2 form from Payroll. The net after these deductions was paid to Worker. The remaining 75% of the gross piece rate earnings was paid to Worker by Jensen Logging as a lump sum with no deductions or withholdings. Jensen referred to this 75% share as saw rental.

Jensen made it clear that he hired, and had the power to fire, all loggers, loppers, and skid crew members working for him. He did not depend on Payroll to hire, screen, evaluate, or supervise the employees he "leased" from Payroll. Payroll did not come on-site. Jensen hired his workers directly before Payroll even knew of them and then sent the worker's information to Payroll for processing. Jensen used Payroll, at least in part, to provide a method for loggers to obtain workers' compensation insurance, but he could not recall how he contracted with Payroll.

The testimony concerning the potentially seasonal nature of logging was variable. Jensen testified logging occurred anywhere from eight to ten months per year, with an average of nine months per year. Martinez testified logging was available nine to ten months per year. Worker testified he thought it was not seasonal work. The only time Worker thought he could not log was when it rained because the Forest Service closed the roads to avoid damage to them. He testified that the coldest weather was the best time to cut. And the Forest Service sometimes limited cutting when the fire danger was high. The WCJ declined to find that logging is seasonal.

Worker was injured on July 27, 1990, when a dead limb fell from a tree and hit him on the head and shoulders. Medical examination and testing reveal he suffered a vertebral disc herniation at the L5–S1 level. Conservative treatment has not resulted in any demonstrable improvement in Worker's condition. Surgery has been suggested, but Worker has refused to submit. Dr. McCutcheon has set Worker's permanent physical impairment rating at ten to twelve percent. Worker reached maximum medical improvement on or about September, 1991.

According to the findings of the WCJ, Worker is totally and permanently disabled from returning to his job as a logger. A functional capacity assessment of Worker indicates he can lift and carry up to twenty pounds frequently, and up to a maximum of thirty pounds occasionally. The assessment indicates Worker can stand and walk up to two hours at a time but can sit only one half-hour at a time. The assessment further shows that Worker can occasionally bend, crawl, and climb and can frequently squat and reach. Repetitive activities cause muscle cramps in both extremities. The restrictions place Worker at a light to medium work duty level.

Worker was born in Mexico. Worker's formal education is limited to the equivalent of the fourth grade. He received all of his formal education in Mexico. Worker has not received any formal education or other work training since he was about eleven years old. Worker cannot read in English, but he can read Spanish slowly. The WCJ found that Worker does not understand spoken English, and cannot speak English. Employer asserts in its brief-in-chief that Worker has a working use of the English language. However, there is substantial evidence supporting the WCJ's findings to the contrary. It is

clear from the taped transcript that Worker required translation help to adequately understand and converse.

Employer submitted testimony of a vocational rehabilitation counselor who worked with Worker for a time attempting to identify jobs within his limitations. The counselor asserted that she identified several jobs which Worker was capable of performing, including: (1) packing wood for sale at convenience stores; (2) wood trimmer and molding feeder; (3) wood preservation treatment; (4) jewelry molder; (5) food assembler; (6) wood working and carpentry; (7) bakery work; and (8) telemarketing, among others. However, on cross-examination, the counselor admitted she had not adequately taken into consideration the requirements of several of the positions and the Worker's limitations. The counselor did not determine the lifting, or other physical requirements, of the wood packing, wood treating, and bakery jobs she identified. The telemarketing job required computer data entry, memorization of computer codes, and a three-week training course in English. Other positions identified would be theoretically appropriate if the employer would agree to modification of work routine or load. There was no evidence the employers would agree to the modifications. The counselor was requested to provide a percentage figure representing the reduction of jobs reasonably available to Worker as a result of his injuries. She was unable to do so, but stated that the reduction would not be substantial. Worker has not been provided any vocational rehabilitation or retraining. Worker has not returned to any gainful employment since July 1990.

## DISCUSSION

### I. APPLICATION OF SCRA 1986, 12-213(A)(3)

■ Worker requests that we apply SCRA 1986, 12–213(A)(3) (Cum.Supp.1994) and refuse to deal substantively with Employer's evidentiary challenges. Worker notes that Employer failed to refer to or acknowledge important portions of the evidence bearing on the issues Employer presses. Failure to include in the briefs before us the substance of the evidence bearing on a proposition can result in a finding that the challenging party has waived the contention. *See Martinez*, 115 N.M. at 186, 848 P.2d at 1113. *Martinez* placed a high, but appropriate, responsibility on appellants relying on lack of substantial evidence as a basis for reversal, to set forth the substance of *all* evidence on point, including a statement of all reasonable inferences that can be drawn from the evidence. *Id.* at 184–85, 848 P.2d at 1111–12.

■ Here, we have decided not to find a violation of SCRA 12–213(A)(3), and we will deal with the substantial evidence issues raised by Employer on their merits. We observe, however, that Worker's motion was not frivolous. Employer's compliance with the spirit of SCRA 12–213(A)(3) was marginal at best. Employer's counsel has already suffered a *Martinez* sanction in a similar case. *See Apodaca v. Payroll Express Inc.*, 116 N.M. 816, 867 P.2d 1198 (Ct.App.1993). We caution all appellate counsel to comply fully with the rule.

### II. COMPUTATION OF AVERAGE WEEKLY WAGE

Employer challenges the WCJ's wage calculation on two separate grounds. First, Employer asserts the WCJ failed to deduct Worker's expenses from his gross piece rate earnings in order to arrive at his "real economic gain." Second, Employer asserts that logging is seasonal and the WCJ's application of NMSA 1978, Section 52–1–20(B) (Repl. Pamp.1991) (effective until Jan. 1, 1991) to determine the average weekly wage is incorrect.

#### A. Real Economic Gain

It is apparent from the Findings of Fact that the WCJ chose to calculate Worker's average weekly rate on a gross basis. The WCJ found that Worker's pay should include the amounts paid by both Jensen Logging and Payroll. This is consistent with the WCJ's determination that Worker was an employee of Jensen Logging, and not an independent contractor. Further, the WCJ found that all the amounts paid by Jensen Logging were wages as such. Dividing Worker's gross compensation by the number

of weeks he worked in 1990 yielded an average weekly wage of $474.41 per week.

Disputing the WCJ finding that all payments were wages, Employer offers two arguments. First, Jensen describes the 75% paid by his company as "saw rental"; that is, reimbursement to Worker for the use of his saws which Employer maintains should not be included in the wage calculation. Secondly, Jensen argues that even if the payment was not "saw rental," Worker should be required to deduct from his wages actual reimbursement for out-of-pocket costs such as repair, servicing, replacement of equipment and so forth. Further, Employer would place the burden of proof on Worker to show what portion of his wages were *not* intended as a reimbursement for job-related expenses. Since Worker was unable to document precisely his equipment costs, Employer asks us to impute the major share of the 75% paid by Jensen for this purpose as expense reimbursement and not as wages. We do not agree with Employer on either contention, and affirm the WCJ.

"Wages" as defined, includes the money rate at which the services rendered are recompensed under the contract of hire in force at the time of the accident. NMSA 1978, Section 52–1–20(A) (Repl.Pamp.1991) (effective until Jan. 1, 1991). Wages do not include "the amounts deducted by the employer under the contract of hire for materials, supplies, tools and other things furnished and paid by the employer." *Id.* Section 52–1–20(A) does not provide any other specific guidance for the calculation.

Employer's first argument is easily answered. Jensen testified that the 75% contribution from his company was "saw rental." Worker testified to the contrary; that he understood it was all part of his compensation package purely for labor. The contract for hire does not support the claims of Employer; there is no mention of "saw rental." Even if the contract had so stated, Section 52–1–20(A) only exempts from wages those amounts "deducted by the employer ... for tools ... furnished and paid for by the *employer*." (emphasis added). The statute clearly does *not* apply here. The Contract specified that the Worker, not Employer,

must supply and repair his own equipment at his own cost, and Worker agreed with that understanding. Employer did not deduct any amounts for materials, tools or supplies.

The WCJ had no trouble examining, dissecting, and then rejecting the so-called "saw rental" as a sham. WCJ finding No. 14 states: "The rental arrangement for saws was a fraud and a sham intended to reduce transfers from Jensen to Payroll Express." WCJ finding No. 10 states: "Worker's wages should include all amounts paid by Jensen Logging. The amounts paid were wages. The documents required by Jensen Logging were an effort to defraud Payroll Express and Worker." These findings are supported by substantial evidence. While these findings of fraud are not crucial to affirmance, they do help explain and support the decision of the WCJ as to Worker's employment status, and the WCJ's refusal to allow deductions from Worker's earnings. Indeed, the record shows that Employer's primary rationale in structuring the employment arrangement in this fashion was simply to avoid having loggers as employees, thus evading Jensen's responsibilities under the Workers' Compensation laws. It was clearly the view of the WCJ that Jensen overreached in pursuit of his desire to simplify life as an employer. The gist of these findings is that the entire structure of the employment arrangement between Worker and Employer did not reflect the reality of the transaction. The WCJ's decision that payments made by Jensen Logging was compensation pure and simple is supported by substantial evidence.

Employer's second contention requires additional analysis. As we have noted, the contract for hire did not specify any portion as reimbursement for expenses, including the various job-related expenses Employer now claims. None of these were "things furnished and paid for by the employer." Section 51–1–20(A). Undaunted, Employer urges the Court to deduct the costs of all these personally incurred, but job-related equipment expenses to arrive at a net figure assertedly representing Worker's "real economic gain" (wages minus expenses).

Employer relies on *Gonzales v. Mountain States Mut. Casualty Co.,* 105 N.M. 100, 728

340

P.2d 1369 (Ct.App.1986) for support. Factually, however, *Gonzales* presents the opposite scenario, where worker *increased* her wages by inclusion of the real economic gain from keeping excessive expense reimbursement. In *Gonzales*, the claimant drove a school bus under a detailed contract, written by the employer, which provided for payment of a total sum, but specifically designated categories of expenses being covered and assigned a dollar value to each category representing reimbursement for expenses in addition to salary for services. Most of the categories dealt with expenses related to bus fueling, maintenance, operation, depreciation. One category was "driver's salary and institute increment." *Id.* at 101, 728 P.2d at 1370. The trial court considered only the driver's salary category in calculating the claimant's average weekly wage. *Id.* Claimant argued that this undervalued her "real economic gain" from the contract because she was able to meet all of her responsibilities under the other categories for less than the amount allocated. Because she was paid the full contract amount for each category whether she spent the full allocation or not, she realized a net gain in addition to her salary. *Id.* Under those facts, this Court reversed and held that claimant should be allowed to prove the additional gain, created by her efficiency, and that net gain should be added to her average wage for purposes of workers compensation computation. *Id.* at 103, 728 P.2d at 1372.

*Gonzales* was concerned with the treatment of reimbursement payments for purposes of wage calculations. In this case, there is no provision in the employment relationship between Worker and Employer for any "dollar-for-dollar" reimbursement. *Id.* at 102, 728 P.2d at 1371. There are no specific contractual provisions here designating categories of expenses. The arrangement here is to the opposite effect. It is safe to say that the last thing Employer desired or contemplated were requests from Worker for reimbursement of expenses. Employer consciously sought to reduce Worker's wage for worker's compensation purposes to suit its own ends. Once the Employer's characterization of the relationship was swept aside, the controlling provision was the piece rate

to be paid Worker. We see no reason to impose the rationale underlying the cases dealing with the treatment of reimbursement of board, lodging, or car expenses on a relationship which did not contemplate reimbursements in the first place.

The convoluted arrangement created by Jensen and Payroll has been before this court twice previously. *See Apodaca; Lujan v. Payroll Express, Inc.*, 114 N.M. 257, 837 P.2d 451 (Ct.App.), *cert. denied*, 114 N.M. 62, 834 P.2d 939 (1992). In each case we confessed some discomfort with the state of the record and the information it provided or failed to provide with regard to the full contours of the employment relationship created and the nature of the compensation received by loggers under the scheme. In *Lujan*, we remanded to allow further review of the WCJ finding that worker was an independent contractor, noting that the parties' characterization of a business relationship "may not reflect the substance of the relationship." *Lujan*, 114 N.M. at 261, 837 P.2d at 455.

In *Apodaca*, we upheld a finding that the worker was an employee and not an independent contractor. *Apodaca*, 116 N.M. at 819, 867 P.2d at 1201. We remanded for further review to provide the WCJ an opportunity to accept further evidence and make further findings on the issue of the worker's average weekly wage. We did not have sufficient, or sufficiently clear, evidence in the record to determine what should be included in the wage calculation. We remanded so the WCJ could sort through the employment arrangement and "make a determination what are and what are not wages." *Id.* at 820, 867 P.2d at 1202.

Our opinions in *Lujan* and *Apodaca* were available to the WCJ upon hearing the evidence in this case. The record reflects a full and fair factual presentation concerning payments made to Worker and the expenses he incurred in order to do his job. The WCJ asked pertinent questions concerning the payment arrangements imposed by Payroll and Jensen. Jensen strenuously argued its position with regard to Worker's independent contractor status and the need to deduct all job expenses, including worker compensation

insurance premiums, from Worker's earnings. Employer requested extensive findings of fact on its theory of deductions. We are satisfied that the WCJ was presented with sufficient information to inform himself fully on the issues and the alternatives available for their resolution. We cannot conscientiously say the WCJ's resolution of the issue is erroneous as a matter of law. *See Pinetop Truck & Equip. Supply v. Industrial Comm'n,* 161 Ariz. 105, 776 P.2d 356, 358 (Ct.App.1989).

Employer cites *Apodaca* in support of his proposition that job-related expenses must first be deducted from a calculation of wages, unless Worker can show differently. We acknowledge that dictum in *Apodaca* may be interpreted in this manner, partially because, as we have said, *Apodaca* was written without the benefit of a mature record. For example, the court in *Apodaca* had to assume, hypothetically, as we do not, a contractual arrangement which in terms of actual, economic reality represented one contract for a full-fledged compensation for labor, and another contract strictly for reimbursement of employer-related expenses. However, the facts in this case stray wide of that mark, showing that, in reality, Employer was engaged in a conscious attempt to minimize compensation for Employer's own self-serving motives. Therefore, on its face, *Apodaca* is an inappropriate choice of authority for this particular Employer.

Moreover, we perceive a certain misguided vision in Employer's argument. Employer's position boils down to an assertion that all expenses incurred by an employee in doing a job must be deducted from wages in order to determine "real economic gain." A logical extension of Employer's position is that items such as tool costs, cost of transportation to the job, meals, lodging, and clothing must also be deducted. We foresee expansion of the deductions list. We will not catalog the items which could imaginatively be included as employee expenses in getting to and doing a job. Suffice it to say, the list could include all life sustaining expenses of the employee. We do not believe the Worker's Compensation Act contemplates deductions from earnings of the sort argued by Employer. *See*

*Little Suwannee Lumber Co. v. Fitzgerald,* 172 Ga.App. 144, 322 S.E.2d 347 (1984). We will not start the journey down that slippery slope in this case.

We think it important to be clear with regard to *Apodaca.* Hypothetically, it is certainly possible to envision an arrangement, not unlike that in *Gonzales,* where actual "dollar-for-dollar" expense reimbursements would be clearly incorporated into a contract, or second contract, separate from an honest, full-fledged compensation arrangement. In such a situation, those payments would not be wages, except for reimbursements in excess of costs as in *Gonzales,* since they would merely reimburse worker for out-of-pocket payments to third parties for those same expenses. We suppose, theoretically, the situation in *Apodaca* could have turned out the same way on remand. However, *Apodaca* should not be read, in any sense, to expand upon our prior opinion in *Gonzales,* and especially not to place a burden of persuasion or proof upon worker, that moneys paid are anything but wages. The only exception would be, as in *Gonzales,* where the contract clearly, fairly, and honestly denominates and describes those payments as something other than wages and where worker seeks the advantage by claiming a "real economic gain" from excess expense reimbursement beyond his or her salary. Then, and only then, should the burden be placed fairly upon the worker. Any dictum in *Apodaca* which implies to the contrary should be read narrowly and with great caution by the WCA.

**B. Seasonal Employment**

The WCJ refused Employer's requested findings of fact that logging is seasonal employment. Pursuant to this denial, the WCJ calculated Worker's average weekly wage by dividing his income by the number of weeks he worked for Employer in 1990, rather than spreading the earnings over a full year. Employer asserts that *Apodaca,* requires recognition that logging is a seasonal activity. 116 N.M. at 821, 867 P.2d at 1203. We disagree. In *Apodaca,* we assumed, without analysis, that logging is seasonal based on testimony there that logging takes place only between May and December. *Id.* The testimony in

this case is different. Jensen and Martinez testified that logging goes on for up to ten months per year. Perhaps more telling, it is not directly the weather or lack of product that prevents logging during stoppages. Worker testified that logging is in fact best during the coldest part of the year and that work generally stops only occasionally when the Forest Service closes the roads or when the forest is dry creating a high risk of fire. The inference can reasonably be drawn that in New Mexico there is nothing inherently seasonal about logging. It could be carried on year round, but for the intervention of the Forest Service. *See Pettis v. Industrial Comm'n,* 91 Ariz. 298, 372 P.2d 72 (1962) (en banc).

■ Our Workers' Compensation Act does not provide a definition of seasonal employment. Moreover, we are not aware of any cases in New Mexico which provide a general, working definition of seasonal employment which we can apply. Authority from other jurisdictions is helpful, though not definitive because of statutory variations. Generally, seasonal employment refers to that kind of labor which can only be carried on at certain seasons or regularly recurring periods of the year, either because of weather constraints or simply because of the availability of the product to be worked. Seasonal employment does not include activities which can be carried on essentially year round, even if the work may be occasionally interrupted by producers, market fluctuations, or other outside agents. *See, e.g., Id.* 372 P.2d at 74–75 (logging not seasonal employment); *In re Land O'Lakes Creameries,* 243 Minn. 408, 68 N.W.2d 256, 259 (1955) (turkey processing is seasonal under provision of statute); *Bielke v. American Crystal Sugar Co.,* 206 Minn. 308, 288 N.W. 584, 586 (1939) (beet sugar processing is seasonal); *Gorham v. Peter Kiewit Sons Co.,* 129 Neb. 277, 261 N.W. 353, 354 (1935) (bridge building not seasonal); *Hogsett v. Cinek Coal & Feed Co.,* 127 Neb. 393, 255 N.W. 546, 547 (1934) (handling and delivering coal for retail coal dealer not seasonal); *Dazely v. Luckenbach S.S. Co.,* 133 Pa.Super. 507, 3 A.2d 190 (1938) (stevedoring not seasonal even though variable because dependent on ships coming into port); *Beers v. Commonwealth Unemploy-ment Compensation Bd. of Review,* 118 Pa. Cmwlth. 248, 546 A.2d 1260, 1267 (1988) (seasonal industry is work or process which can only be carried on from a practical standpoint for regularly recurring period of 180 days or less a year).

■ On the basis of the record before us, we conclude that the WCJ properly determined that logging is not seasonal employment for purposes of the New Mexico Workers' Compensation Act. Thus, the WCJ's use of Section 52-1-20(B) to determine average weekly wage was appropriate.

## III. PERMANENT PARTIAL DISABILITY DETERMINATION

■ The WCJ found that Worker suffered an 86% permanent partial disability. The WCJ refused Employer's requested finding that Worker is only 20% disabled. Employer attempts to mount a legal challenge to the WCJ's finding by asserting that the WCJ must have applied an improper standard because there are no detailed findings concerning the effect the injury had on Worker's "spectrum of employment." *See Barnett & Casbarian, Inc. v. Ortiz,* 114 N.M. 322, 329, 838 P.2d 476, 483 (Ct.App.), *cert. quashed,* (Aug. 20, 1992). It is accurate that the WCJ entered terse findings with regard to Worker's disability. However, this by itself is not reversible error. We have repeatedly observed that findings of ultimate fact are sufficient for our review. *Apodaca,* 116 N.M. at 819, 867 P.2d at 1201, *Griego v. Bag 'N Save Food Emporium,* 109 N.M. 287, 291, 784 P.2d 1030, 1034 (Ct.App.1989), *certs. denied,* 109 N.M. 262, 784 P.2d 1005 (1990); *see* SCRA 1986, 1-052(B)(1)(b) (Repl.1992). This is particularly true where the WCJ has reviewed and denied detailed requested findings from the appellant, as is the case here. In addition, the WCJ here made detailed findings concerning the Worker's age, education, and vocational background. There is no indication in the record that the WCJ depended on job availability, as such, in making the disability determination.

■ In sum, Employer's challenge is to the sufficiency of the evidence supporting

the WCJ's decision. Determination of a partial disability award is necessarily fact driven, and as a result we do not ordinarily review the WCJ's percentage determination on appeal. *Ortiz,* 114 N.M. at 329, 838 P.2d at 483. Here we determine that there is sufficient evidence of record to support the WCJ's decision. The decision reflects the reality that an English illiterate, poorly educated, forty-five year old worker with a vocational history limited to hard manual labor in agriculture and logging, and now saddled with a serious back injury, faces tremendous employment difficulties in our economy.

We affirm. Worker is awarded $3500, plus applicable gross receipts tax, as attorney's fees for this appeal.

**IT IS SO ORDERED.**

FLORES and BOSSON, JJ., concur.