924 P.2d 1362

**Eotavio MEDINA, Jr., Worker–Appellant/Cross–Appellee,**

v.

**BERG CONSTRUCTION, INC., and New Mexico Mutual Casualty Company, Employer/Insurer–Appellees/Cross–Appellants.**

No. 16456.

Court of Appeals of New Mexico.

Aug. 7, 1996.

James R. Beam, Albuquerque, for Appellant and Cross–Appellee.

Michael J. Happe, Timothy R. Briggs, Miller, Stratvert, Torgerson & Schlenker, P.A., Albuquerque, for Appellees and Cross–Appellants.

## OPINION

BUSTAMANTE, Judge.

1. Worker, Eotavio Medina, Jr., appeals, and Employer–Insurer (Employer) cross-ap-

peals from a compensation order amending the compensation order and the award of attorney fees and costs. Worker challenges (1) the decision of the Workers' Compensation Judge (WCJ) holding that his previous work in the mines near Grants, New Mexico, was as a miner, as described in the DOT Job Code 850.381.010 in the *Dictionary of Occupational Titles* (*Dictionary*), published by the Department of Labor; and (2) the WCJ's determination that he was entitled to zero points in calculating his residual physical capacity based on his ability to perform a specific vocational pursuit.

2. Employer raises four issues in its cross-appeal: (1) whether the WCJ erred as a matter of law in determining that Worker's residual capacity was light; (2) whether the medical expenses awarded to Worker exceeded the amounts allowed by law; (3) whether the WCJ abused his discretion in awarding attorney fees; and (4) whether the WCJ erred in ordering Employer to pay all of the discovery costs incurred by Worker.

3. We hold that the WCJ erred in finding that Worker was not entitled to any points in determining his rate of permanent partial disability under NMSA1978, Section 52–1–26.3(D) (Repl.Pamp.1991) (effective Jan. 1, 1991). We affirm on all other issues raised in the appeal and cross-appeal.

*FACTS*

4. We confine our recitation of the facts and procedure below to those relevant to the issues raised on appeal. Worker was, at time of trial, forty-four years old. He has lived in Grants, New Mexico, for twenty-one years. Before he went to work for Berg Construction, he had worked for substantial periods of time in the mines near Grants and as a truck driver. His work for Berg Construction was as a construction laborer. Worker has an eighth grade education and, although he speaks English well, has difficulty reading and writing English. He was injured on August 11, 1993, while carrying rebar with some of his coworkers. His coworkers set down their end of the rebar without warning Worker, suddenly subject-

ing him to the full weight of the rebar. Worker immediately felt pain in his back. He left work later that day and, at the time of the formal hearing, had not returned to work.

5. Worker was treated for his back injury by Dr. Brian P. Delahoussaye and, at the direction of Dr. Delahoussaye, by physical therapist Gary Saunders. On November 11, 1993, Dr. Delahoussaye signed a medical work release. At that time, Dr. Delahoussaye restricted Worker's lifting to up to fifty pounds occasionally and up to twenty pounds frequently. Employer then reduced Worker's compensation benefits from temporary total disability to payments based on an 11% permanent partial disability.

6. Worker was still in pain when he was released by Dr. Delahoussaye, and, when the pain did not go away, consulted Dr. George R. Swajian. Dr. Swajian prescribed additional conservative treatment, and, because Worker lived in Grants, referred Worker to Dr. Louis T. Uttaro, a Grants chiropractor, so that Worker would not need to drive into Albuquerque every day for his treatment. As a result of a mediation conference held by the Workers' Compensation Administration, Employer agreed to pay additional temporary total benefits while Worker received treatment from Doctors Swajian and Uttaro. However, the treatment by Dr. Uttaro did not result in any improvement. At the end of the treatment, Employer again terminated temporary total disability payments and reinstated permanent partial disability benefits at the rate of 11%. Later, for reasons discussed below, Employer refused to pay a portion of Dr. Uttaro's fees for treatment of Worker.

7. Worker received an Independent Medical Examination (IME) by Dr. Robert W. Benson. Dr. Benson concurred in Dr. Delahoussaye's diagnosis of a sprain or strain to the lower back.

8. At the formal hearing, Worker testified that he had lived in Grants for twenty-one years. For ten of those years he worked in underground mines. He described his

work in the mines as follows: "I was a driller—blaster—handling the drill machines—dragging the drill machines—lot of heavy lifting—running an underground loader—different types of equipment for underground." He alternately characterized his job as that of a mining laborer or a miner. On cross-examination, he agreed that he did all aspects of mining work, including running a drill and operating underground loaders, slushers, and mucking machines. He also agreed that his usual and customary work was as a miner, that was why he had moved to Grants, and that when there was no mining work available, he went to work as a truck driver. The only construction work he had done since moving to Grants was the four months that he worked for Berg Construction.

9. Employer presented the testimony of Yolanda Mascarenas, the claims adjuster assigned to Worker's case. Mascarenas testified that New Mexico Mutual had refused to pay approximately $727.57 of Dr. Uttaro's fees based on an internal audit performed by another New Mexico Mutual employee. Mascarenas did not prepare the notice to Dr. Uttaro's office and could not explain why certain charges by Dr. Uttaro had not been paid.

10. During closing arguments, both parties presented their views concerning the application of the statutory disability formula. Both sides agreed that, with respect to the education modifier, Worker was entitled to zero points for age and one point for his eighth grade education. Again with respect to the education modifier, Worker's attorney argued: (1) that Worker's usual and customary employment was as an underground driller machine operator, DOT 930.382–010 (SVP 2); (2) that Worker was entitled to one additional point under Section 52–1–26.3(D) because he could no longer perform a specific vocational pursuit; and (3) that Worker's residual physical capacity under Section 52–1–26.4 was light duty. Worker's counsel also argued that Dr. Uttaro's treatment was reasonable and necessary, and therefore Employer should pay the balance of Dr. Uttaro's fees.

11. With respect to the issues on appeal, Employer contends: (1) that Worker's usual and customary employment was as a miner, DOT 850.381–010 (SVP 7); (2) that Worker was not entitled to an additional point under Section 52–1–26.3(D); (3) that Worker's residual physical capacity was medium rather than light duty; and (4) that Dr. Uttaro had been paid pursuant to the audit conducted by New Mexico Mutual, and if Dr. Uttaro wished to challenge the audit, Dr. Uttaro should take that up with the Director of the WCA under the applicable rules and regulations. Employer briefly indicated its belief that Dr. Uttaro's charges exceeded the MAP schedule, and that ordering payment of the balance would be tantamount to ordering New Mexico Mutual to violate the law.

12. At some time after the hearing, the WCJ issued a letter decision which, unfortunately, is not part of the record on appeal. Both parties filed proposed findings and conclusions. We note in passing that in his proposed findings, Worker asked the WCJ to find that his work in the mines be classified as labor or construction work, DOT 869.687.026 (SVP 2), making his work as a truck driver, DOT 904.383.010 (SVP 4), the job with the highest SVP level in the last ten years.

13. In the compensation order filed May 1, 1995, the WCJ found that Worker's occupation was as a miner, DOT 850.381–010 (SVP 7); that Worker could perform a specific vocational pursuit and, therefore, should receive zero points under Section 52–1–26.3(D); that Worker's residual physical capacity was for light duty under Section 52–1–26.4(C)(3); and that Dr. Uttaro's fees were reasonable and necessary and should be paid by Employer.

14. After entry of the compensation order, proceedings were held on fees and costs. In addition, both parties filed motions for reconsideration directed to various portions of the compensation order, and a hearing was held on the issues raised in the motions for reconsideration. Ultimately, the WCJ entered an amendment to the compensation

**354**

order that rejected most of the arguments raised by the motions for reconsideration, determined that a reasonable fee for Worker's attorney was $6500 plus tax, and ordered Employer to pay all of Worker's discovery costs incurred in prosecuting his case.

15. Because the record clearly indicates that the WCJ considered the additional arguments and materials submitted on the motions for reconsideration, we hold that those materials are before this Court on appeal, and that the arguments raised during those proceedings are properly preserved for appeal. *See Garcia on Behalf of Garcia v. La Farge,* 119 N.M. 532, 540, 893 P.2d 428, 436 (1995) (purpose of preservation requirement is to give the trial judge an opportunity to correct a claimed mistake and to give the opposing party a fair opportunity to meet the objection); *In re Estate of Keeney,* 121 N.M. 58, 60–61, 908 P.2d 751, 753–54 (Ct.App.) (holding that affidavits submitted with motion to reconsider ruling on summary judgment are properly before the appellate court), *cert. denied,* 120 N.M. 828, 907 P.2d 1009 (1995).

*WORKER'S APPEAL*

A. *DISABILITY DETERMINATION.*

■ 16. *Proper Characterization of the Work in the Mines.* Worker argues that the WCJ's determination that his occupation in the mines was as a miner, DOT 850.381.010 (SVP 7, exertion level heavy) is not supported by substantial evidence when viewed in the light of the record as a whole. *See Murillo v. Payroll Express,* 120 N.M. 333, 335, 901 P.2d 751, 753 (Ct.App.1995) (standard of review).

The job title adopted by the WCJ reads as follows:

850.381–010 Miner (const.)

Drills and blasts earth and rock excavations to construct underground shafts and tunnels for projects, such as roads, railways, and waterways: Sets up pneumatic drilling machinery and moves lever controlling drilling action to drill blastholes in "tunnel heading" according to spacing, angle, and depth of hole specified by SUPERVISOR, TUNNEL HEADING (const.). Loads blastholes and fires powder charges to loosen earth and rock [BLASTER (any ind.)]. Wedges, nails, or bolts timber or steel retaining structures to prevent cave-ins. May work in caissons. When concerned with erection of breast boards (timber bracing) to shore tunnel heading is designated as BREAST WORKER (const.).

*Dictionary,* 850. Worker points out that this job description emphasizes the difficult and highly skilled occupation of working with explosives and argues that the evidence, considered in the light of the whole record, does not support this job description. Worker, to his credit, recognizes that he did testify that he had done blasting in the mines, but argues that his testimony emphasized the operation of heavy equipment, and thus the one mention of blasting coupled with his references to himself as a *miner* are not substantial evidence to support the WCJ's finding.

■ 17. Under the circumstances of this case, we disagree. Ordinarily, the determination of a worker's usual and customary work is a question of fact for the WCJ. *See Levario v. Ysidro Villareal Labor Agency,* 120 N.M. 734, 736–38, 906 P.2d 266, 268–70 (Ct.App.1995). Similarly, we believe that the question of the proper job title and DOT code to be assigned to work performed by a particular worker in a particular job is essentially a factual matter. When a finding of fact is made against the party having the burden of proof on an issue, we can affirm if it was rational for the fact-finder to reject the evidence advanced in support of the finding. *Sosa v. Empire Roofing Co.,* 110 N.M. 614, 616, 798 P.2d 215, 217 (Ct.App.1990).

18. In the proceedings below, Worker did not take a consistent position concerning his DOT job description and job code. During closing arguments, Worker argued that his work was as an underground driller machine operator, DOT 930.382–010 (SVP 2). In his proposed findings, Worker requested a finding that his work in the mines was best

characterized as labor construction work, DOT 869.687.026 (SVP 2). In his motion for reconsideration, Worker argued that his job could best be characterized as either loading machine operator helper, DOT 939.686–010 (SVP 3), or company laborer, DOT 939.687–014 (SVP 1). Each of these proposed job descriptions and codes has obvious drawbacks. For example, it is clear from his testimony that the work in the mines included considerably more than operating a driller machine or loading machine and included work that is not included in the descriptions of labor construction work or company laborer. Under these circumstances, we think that the WCJ could rationally reject the job descriptions and job codes offered by Worker and adopt that offered by Employer.

19. The evidence concerning Worker's duties in the mines was relatively brief. At times Worker characterized himself as a miner and at other times as a mine laborer. While his testimony emphasized the operation of heavy equipment, he did testify that he had performed blasting. Under the circumstances of this case, we hold that the WCJ's determination of the DOT job title and code is supported by substantial evidence. Moreover, to the extent that Worker argues that the job title adopted by the WCJ is for an inappropriate category and division as those terms are used in the *Dictionary*, we point out that the issue on appeal is whether the finding made by the WCJ is supported by substantial evidence, not whether the evidence would have supported different findings. *See Gallegos v. City of Albuquerque*, 115 N.M. 461, 465, 853 P.2d 163, 167 (Ct.App.), *cert. denied*, 115 N.M. 535, 854 P.2d 362 (1993).

20. *Ability to Perform a Specific Vocational Pursuit.* Worker contends that the WCJ erred when he failed to award Worker an education modification point under Section 52–1–26.3. Section 52–1–26.3 modifies a worker's impairment rating depending upon the level and type of education a worker has received. The three types of education discussed in Section 52–1–26.3 are formal education (subsection B), skills (subsection C), and training (subsection D). The more education, skills, or training a worker has acquired, the fewer points he will be awarded. *See generally* Kelly Brooks et al., Comment, *Workers' Compensation* 22 N.M.L.Rev. 845 (1992).

21. The application of Subsection D is at issue in this case. The subsection reads as follows: "A worker shall be awarded points based upon the training he has received. A worker who cannot competently perform a specific vocational pursuit shall be awarded one point. A worker who can perform a specific vocational pursuit shall not receive any points." The WCJ found that Worker can perform a specific vocational pursuit and therefore did not assign a point for this component of the education modifier. The WCJ did not specify what vocational pursuit he found Worker able to perform. Worker contends that the statute contemplates the award of one point to a worker who, at the time of his disability rating, can no longer perform any of his former occupations. We agree.

22. Section 52–1–26.3(D) does not define the terms "competently" or "specific vocational pursuit." However, the language in a statute is given its ordinary meaning. *Bustamante v. De Baca*, 119 N.M. 739, 742, 895 P.2d 261, 264 (Ct.App.1995). *Black's Law Dictionary* 284 (6th ed. 1990) defines "competent" as: "Duly qualified; answering all requirements; having sufficient capacity, ability or authority; possessing the requisite physical, mental, natural or legal qualifications; able; adequate; suitable; sufficient; capable; legally fit." In addition, the phrase "specific vocational pursuit" refers to the jobs or occupations as defined by the *Dictionary* that the worker has performed successfully in the past. Thus, the ordinary meaning of the statute is that a worker who, at the time of his disability rating, is unable to return to any of his former occupations due to his disability should receive one point.

23. Employer concedes that this is the plain meaning of the statute, but argues that

the WCJ properly awarded no points in this case because Worker is able to perform work at the medium exertional level and, therefore, can return to work as a truck driver. However, in the next section of this opinion we reject Employer's argument that Worker is able to perform at the medium level contemplated by the statute. Worker's residual physical capacity has been classified as "light." *See* § 52–1–26.4. Therefore he cannot "competently perform" any of his previous vocations. We hold that there was insufficient evidence in the record to support the WCJ's finding. Worker should have been awarded one point under subsection D.

■ 24. *Residual Physical Capacity.* Employer contends that the WCJ erred as a matter of law in determining Worker's residual physical capacity under Section 52–1–26.4. Employer recognizes that this determination is ordinarily an issue of fact. *See Slygh v. RMCI, Inc.,* 120 N.M. 358, 359, 901 P.2d 776, 777 (Ct.App.1995) (treating residual physical capacity as a fact issue and holding that the WCJ can properly consider the testimony of the Worker in addition to the testimony of a health care provider in making this factual determination). Employer agrees that Worker is medically restricted to occasional lifting of fifty pounds, frequent lifting of twenty pounds, and continuous lifting of ten pounds. Instead, Employer argues that the WCJ misread and, therefore, misapplied Section 52–1–26.4(C) to the facts of this case.

25. Section 52–1–26.4(C) reads in pertinent part as follows:

C. For the purposes of this section:

(1) "H" or "heavy" means the ability to lift over fifty pounds occasionally or up to fifty pounds frequently;

(2) "M" or "medium" means the ability to lift up to fifty pounds occasionally or up to twenty-five pounds frequently;

(3) "L" or "light" means the ability to lift up to twenty pounds occasionally or up to ten pounds frequently. . . .

(4) "S" or "sedentary" means the ability to lift up to ten pounds occasionally or up to five pounds frequently. . . .

Employer contends that the statutory scheme concerning the frequent lifting component involves a range of weight with the upper limit defined in the pertinent section and the lower limit defined by the next lowest level of exertion. Thus, in Employer's view, the medium level of exertion is defined as the ability to lift up to fifty pounds occasionally and between ten and twenty-five pounds frequently. Because Worker can lift twenty pounds frequently, Employer contends that he falls squarely in the medium level of exertion.

■ 26. When the plain language of the statute can be reasonably understood by well-informed persons in two or more different senses, the statute is ambiguous. *See State v. Elmquist,* 114 N.M. 551, 552, 844 P.2d 131, 132 (Ct.App.1992). Thus, we find it necessary to construe the statute. The primary purpose of statutory construction is to discern and give effect to the intent of the legislature. *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994). In so doing, we consider the language of the statute, its background and history, and the legislative object of the statute. *Id.* When the literal language of the statute leads to an unreasonable or absurd result, we will construe the language according to the intent of the legislature. *Id.* at 351–52, 871 P.2d at 1357–58.

27. We disagree with Employer's reading of the statute. Reading the provisions of Section 52–1–26.4, together with the provisions of the other statutory modifiers, we conclude that the legislature intended that a worker must be able to meet all the lifting requirements for each level in order to be classified at that level. *See Madrid v. St. Joseph Hosp.,* No. 23,226, slip op. at 17 (N.M.Sup.Ct. July 22, 1996) (Workers' Compensation Act defines disability and provides guidelines for determining eligibility for benefits by means of statutory mechanism intended to ensure that workers receive fair

and impartial determination of disability). Section 52–1–26.4 allows a worker's initial impairment rating to be modified by his loss of physical capacity. As with the other modifiers for age and education, it permits the individual characteristics of the worker to be taken into account, but these characteristics are measured against an objective standard. Adopting Employer's interpretation would introduce a subjective sliding scale, providing no meaningful guidance to WCJs, workers, or employers. This uncertainty would lead to needless litigation.

## EMPLOYER'S CROSS–APPEAL

### A. DR. UTTARO'S FEES.

■ 28. Employer argues on appeal that the WCJ erred when he ordered Employer to pay the balance owed to Dr. Uttaro because the WCJ failed to apply the MAP schedule to Dr. Uttaro's fees. We note, however, that Employer did not request a finding below that the fees or particular portions of the fees exceeded the MAP schedule. Moreover, during the hearing on the motions for reconsideration, the WCJ indicated that Employer's evidence that Dr. Uttaro's charges were in excess of the MAP schedule was "not, repeat not" persuasive. Under these circumstances, it is clear that the WCJ did not believe Employer's evidence that the charges were in excess of the MAP schedule. Accordingly, there is no factual basis for Employer's legal issues, and we will not discuss them further.

### B. ATTORNEY FEES.

■ 29. Employer attacks the WCJ's determination that Worker's attorney was entitled to a reasonable fee of $6500 plus tax in this case. First, Employer argues that the WCJ incorrectly determined the present value of the benefits to Worker because he failed to take into account the fact that the Employer had voluntarily paid temporary total disability payments and permanent partial disability at the rate of 11%, and thus, in Employer's view, the benefit obtained by Worker's attorney was a 2% increase in the disability rating. However, as Worker points out, Employer's formal answer put in jeopardy all of Worker's compensation benefits. There is no indication that Employer's answer was merely pro forma. Indeed, as late as November 1994, Employer continued to deny that an accident had occurred, and that Worker's back injury was the result of the accident. In addition, the WCJ found that, while there was an offer of settlement at some time after the involvement of counsel for worker, there were no offers of settlement before proceedings were commenced, before mediation, or before trial. Under these circumstances, we agree that Worker's attorney obtained the full present value of the disability award for his client. See Baca v. Highlands Univ., 113 N.M. 170, 172–73, 824 P.2d 310, 312–13 (1992). Employer's reliance on County of Bernalillo v. Sisneros, 119 N.M. 98, 888 P.2d 980 (Ct.App.1994), is unpersuasive since that case dealt with the issue of attorney fees when a case settles for less than the first offer of settlement made by the employer. We think Sisneros is limited to its facts.

■ 30. Next, Employer argues that the WCJ erred in determining the present value of the award because the WCJ improperly determined that the disability would extend beyond six months. In support of this, Employer relies on Amos v. Gilbert Western Corp., 103 N.M. 631, 638, 711 P.2d 908, 915 (Ct.App.1985), and Fitch v. Sam Tanksley Trucking Co., 95 N.M. 477, 480, 623 P.2d 991, 994 (Ct.App.1980), cert. quashed, 95 N.M. 593, 624 P.2d 535 (1981), both cases decided under the law as it existed prior to 1986. However, in Amos, the worker was disabled by a back injury and was still recovering from surgery at time of trial. His doctor opined that he needed additional time to recover from the surgery, but that there was an 80% chance that the worker would fully recover from the injury. The trial court had awarded temporary total disability benefits, and this Court held that, on the facts of that case, it was error for the trial court to determine the present value of the benefits by multiplying the amount awarded for the temporary total disability by the maximum num-

ber of weeks that the worker could receive benefits under the statute. Similarly, while the opinion in *Fitch* does not reveal all the facts of the case, it is apparent that the trial court had erred by basing its fee determination entirely on a percentage of the present value of benefits awarded to the worker.

31. Each of these cases is distinguishable from the instant situation because the WCJ found that Worker's physical impairment is permanent. Moreover, Employer's argument is premised on the optimistic assumption that Worker will return to work as a truck driver at a wage that is equal to or better than his preinjury wage, at which point his disability rating would be equal to his impairment rating. *See* § 52–1–26(D). However, as we have indicated in the past, a middle-aged worker with a vocational history limited to hard manual labor and limited literacy in English faces tremendous employment difficulties in our economy. *Murillo*, 120 N.M. at 343, 901 P.2d at 761.

32. Additionally, Employer contends that the WCJ erred by awarding fees for time spent on issues on which Worker did not prevail. However, Worker's fee petition stated that counsel had reasonably and necessarily spent 94.1 hours on the case, and that his usual hourly rate was $100 an hour. The WCJ awarded a fee of $6500. We find no reason to believe that the WCJ failed to take Employer's position into appropriate consideration in setting the fee.

33. Finally, Employer contends that the fee is excessive because it represents 88% of what Employer contends should have been the present value of the award. However, we have already pointed out that the WCJ did not err in determining the present value of the award to be approximately $21,000. Moreover, the WCJ found that this case was more complex and harder fought than the average case, both of which are factors that would justify a somewhat higher award than might otherwise be the case. Under these circumstances, we hold that a fee of $6500 plus tax is not excessive.

*See Sanchez v. Siemens Transmission Sys.*, 112 N.M. 533, 535–36, 817 P.2d 726, 728–29 (1991); *Cordova v. Taos Ski Valley*, 121 N.M. 258, 264, 910 P.2d 334, 340 (Ct.App.1995); *Benavidez v. Bloomfield Mun. Sch.*, 117 N.M. 245, 249, 871 P.2d 9, 13 (Ct.App.1994).

## C. *COSTS.*

34. As we noted above, the WCJ ordered Employer to pay Worker's discovery costs in the amount of $1916.95. In support of his order, the WCJ cited Section 52–1–54(D) and NMSA1978, Section 52–5–7(F) (Cum.Supp.1995). On appeal, Employer argues that Section 52–5–7(F) was amended, effective June 18, 1993, and that this amended language applies to Worker's case. However, this issue was not raised with the WCJ and therefore cannot be argued for the first time on appeal. *Gracia v. Bittner*, 120 N.M. 191, 196, 900 P.2d 351, 356 (Ct.App.1995) (when a party fails to alert the trial court to the applicability of an amended version of a statute, the issue cannot be raised for the first time on appeal); *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987) (an issue cannot be raised on appeal unless it was raised in the trial court and a ruling invoked thereon).

## *CONCLUSION*

35. In summary, we hold that the WCJ erred as a matter of law in determining that Worker can perform a specific vocational pursuit under Section 52–1–26.3(D). We affirm on all other issues. Thus, this matter is remanded to the Workers' Compensation Administration with instructions that the WCJ amend the compensation order to reflect the award of one point for inability to perform a specific vocational pursuit, and to recalculate the permanent partial disability rating to reflect this change. In addition, the WCJ shall award Worker's attorney reasonable fees for his successful representation of Worker in this appeal.

36. **IT IS SO ORDERED.**

DONNELLY and BOSSON, JJ., concur.